James M. Yates *vs.* The McCullough Iron Company.

*Master and Servant—Assumption of Risk by Servant—Fellow-servant—Question of Law.*

As a general rule, the servant assumes all such risks arising from his employment, as he knew, or in the exercise of a reasonable degree of prudence might have known, were naturally and reasonably incident thereto, and he cannot recover against the master for injuries arising from such patent risks. If, therefore, the machinery or appliances which the master furnishes contains obvious defects, of which the servant knew, or as a reasonably prudent man might have known, or if he continues in the service after he has discovered, or by the exercise of reasonable care might have discovered, the existence of such defects, he cannot recover against the master for injuries resulting therefrom.

In cases where knowledge of the defects does not necessarily carry with it knowledge of the resulting danger, in order to establish that the servant assumed the risks involved in using the machinery, it must appear that the danger was known to him, as well as the defects that caused the danger, or that by reasonable care on his part they would have been known to him.

The plaintiff, while employed in the service of the defendant, a corporation engaged in making charcoal by a patent process, was injured through defects in the machinery used in the charcoal works. The work the plaintiff was engaged in was the simplest kind of manual labor, and the machine he used was exceedingly simple in its construction and operation. The story of the building in which it was located and operated was open from the floor to the rafters. The wheel and track on which it ran were open to view, with no part covered or concealed, and there was nothing latent about the whole apparatus. The plaintiff was perfectly familiar with the machine and its working. He had worked with it for months in the fall and winter of 1885, and during that time, the wheel, while he was working it, fell from the track, at least once, in the same place it fell on the occasion of his injury. When he returned to the employment of the de-

fendant in the spring of 1886, he asked to be put at the same work, and had been so engaged for about two weeks before the accident occurred, with the wheel and track in the same condition they were in when he left them in the preceding winter. HELD:

1st. That the knowledge possessed by the plaintiff of the defects in the machinery, necessarily, and in legal contemplation, carried with it knowledge of the risk, and that he voluntarily incurred the same by continuing in the employment of the defendant.

2nd. That an employé hired by the month, and paid a monthly salary; chief manager of the works, save that the officers of the company were over him; had no direct charge over the machinery, but had the right to repair it, and sometimes did repair it, but had no authority to buy, alter or change it, hired and discharged men, kept their time, made out the pay roll, and sent it to the company's office, where the money due each one was put in an envelope, and when he received it he gave it to the men,—was not a vice-principal or representative of the company, but a fellow-servant of the plaintiff, and the company was not liable for his negligence in the management of the machinery.

Whether, upon a given state of facts, a party is a fellow-servant, or a deputy master, or vice-principal, is a question of law to be decided by the Court.

APPEAL from the Circuit Court for Cecil County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, MILLER, IRVING, BRYAN, and McSHERRY, J.

*Albert Constable*, for the appellant.

In entering upon a service, the servant, of course, assumes all the risks which are incident to that service. But no risk, which reasonable care upon the master's part will remove, is a risk *incident* to the business. Unnecessary danger is negligence in the master. *Indermaur vs. Dames, L. R.,* 1 *C. P.,* 288; *Paulmier, Adm'r vs. Erie R. R. Co.,* 34 *N. J., (Law,)* 151.

The servant has the right to assume that the master has done his duty, and no danger is incident to the service which reasonable care upon the master's part will remove. *Benzing vs. Steinway & Sons*, 101 *N. Y.*, 547; *Wood's Master and Servant*, 763, (2d Ed.)

It is true the servant may assume the risk arising from this unnecessary danger. But before he can be held to have assumed the risk, he must be shown to have known of it, or that the circumstances were such that reasonable care on his part would have disclosed it to him. *Clark vs. Holmes*, 7 *H. & N.*, 549; *Wood's Master and Servant*, 763; *Schall vs. Cole*, 107 *Pa. St.*, 1; *State, use of Hamelin, vs. Malster and Reaney*, 57 *Md.*, 312, 313; *Snow vs. Housatonic R. R. Co.*, 8 *Allen*, 441, 450; *Woodley vs. Metropolitan District Railway Co.*, 2 *Exch. Div.*, 388, 389.

It has indeed been held in a number of cases, and such now seems to be the prevailing opinion, that even knowledge of the danger will be insufficient to disentitle a plaintiff to recover, unless the danger was appreciated, as well as known. *Wood's Master and Servant*, 740, 763, (2d Ed.); *Patterson vs. Pittsburg and Connellsville R. R. Co.*, 76 *Pa. St.*, 389; *Hawley vs. Northern Central R. R. Co.*, 82 *N. Y.*, 370; *Lawless vs. Connecticut River Railroad*, 136 *Mass.*, 1; *Britton vs. Great Western Cotton Co.*, L. R., 7 *Exchq.*, 130; *Thomas vs. Quartermaine*, 18 *Q. B. Div.*, 685; *Yarmouth vs. France*, 19 *Q. B. Div.*, 647; *Osborne vs. London and North Western Ry. Co.*, 21 *Q. B. Div.*, 220.

Conceding, for the sake of the argument, that Cawley was a fellow-workman of the plaintiff, still, in keeping the machinery in repair, he was discharging a duty which rested upon the master, and the master is in that particular responsible for his negligence. *Hough vs. Railway Co.*, 100 *U. S.*, 213; *Benzing vs. Steinway & Sons*, 101 *N. Y.*, 552; *Loughlin vs. State*, 105 *N. Y.*, 159;

Yates *vs.* McCullough Iron Co.

*Lewis vs. Seifert,* 116 *Pa. St.,* 628; *Elmer vs. Locke,* 135 *Mass.,* 575; *Ford vs. Fitchburg R. R. Co.,* 110 *Mass.,* 240; *Shanny vs. Androscoggin Mills,* 66 *Maine,* 420; *Northern Pacific R. R. Co. vs. Herbert,* 116 *U. S.,* 642.

If we concede that Dennis Cawley was a fellow-workman with the plaintiff, and that his negligence *in part* occasioned the plaintiff's injury, still if the appellee's negligence also contributed to the injury, the plaintiff would be entitled to recover, notwithstanding the appellee's negligence was not the *sole cause* of the injury. *Grand Trunk Ry. Co. vs. Cummings,* 106 *U. S.,* 700; *Paulmier, Adm'r vs. Erie R. R. Co.,* 5 *Vroom,* 151; *Elmer vs. Locke,* 135 *Mass.,* 575; *Stringham vs. Stewart,* 100 *N. Y.,* 516, 526.

*L. M. Haines,* and *W. J. Jones,* for the appellee.

MILLER, J., delivered the opinion of the Court.

The plaintiff was injured while in the service of the defendant, a corporation, engaged, among other enterprises, in making charcoal by a patent process. Its works for this purpose are in Cecil County near the village of North East, and the plaintiff was employed at these works. The charcoal, when the process was finished, was taken from the retorts in large iron buckets called "coolers," and these when cooled were hoisted by an elevator into the upper story of a shed or building, where the charcoal was dumped from them upon the floor, and thence through shutes affixed to the sides of the building run into wagons and hauled to the Company's Rolling Mills at North East. The building was about eighty feet long, and the story to which the coolers were hoisted about twenty feet from the ground. Beginning at a point directly over the elevator was an over-head track about twelve feet above the floor, extending the entire length of the

building, and traversed by a wheel to which was appended a yoke with a rod at each end, and these rods by means of trunnions were attached to the sides of the coolers. The elevator well was surrounded by a circular platform three feet wide, raised about two feet from the floor, and the top of the elevator was brought up a few inches above this platform. The cooler was then by the means described attached to the wheel on the railway, and workmen standing behind and on its sides pushed the cooler along this over-head track to the end of the building and there dumped it. When empty these coolers weighed about twelve hundred, and when filled about four thousand pounds. The overhead track was in sections, and was bolted by iron rods called hangers to the rafters of the building.

On the 24th of May, 1886, plaintiff and another were at work pushing these coolers along this track, and having pushed a loaded cooler out and dumped it, were bringing it back to the elevator for the purpose of returning it to retorts below. When it reached the platform around the elevator well, by being slightly tilted to one side it struck the platform, the wheel left the track, and the yoke with the other rigging in its fall struck the plaintiff on his head causing the injuries for which he brought this action.

The plaintiff alleged there was negligence on the part of the company in three particulars. 1st. That the building was too slight to support the immense weights carried by this elevator track; that the track was bolted by rods to the rafters, and these rafters as well as the entire structure itself, were insufficient for the service required, in consequence of which the track sagged under the heavy weights and got out of line; that the end of one rail would get higher than its abutting neighbor, and then, to remedy these inequalities in the track, the end of the highest rail would be

chiseled off; that afterwards when additional hangers were placed at the end of the rails, though the abutting ends would be thus held firmly together, the gutters produced by the former chiselling would remain, and into these gutters the wheel passed as each cooler was pushed over it; that the force exerted by those pushing the cooler over one gutter would unduly increase its speed as it approached the succeeding gutter into which it was liable to rush at too rapid a pace. 2d. That the rail over the elevator was originally placed or suffered to become out of line laterally, the effect of which was to cut away the inner flange of the wheel which gave it a less steady motion and made it less tenacious of the track. 3rd. That the insufficient timber in the building caused the track over the elevator to sag until the cooler, even when empty, was only about one inch above the platform surrounding the elevator, the effect of which was largely to add to the risk of its striking the platform as it passed over it; and that at the time of the injury the force exerted to get it over the gutters in the outer joints had increased its pace so that when the cooler came to the defective joint over the elevator, Maffitt, the other workman, was unable to prevent its tilting slightly toward his side and striking on the floor of the platform.

The testimony as to negligence on the part of the defendant and contributory negligence on the part of the plaintiff was, as is usual in such cases, conflicting, and it need not be stated. Instructions were asked on both sides. The Court granted all those proposed by the plaintiff except his second and third, and also granted seven of those asked by the defendant. The plaintiff's prayers which were granted are not before us for review (he being the appellant) but it is important to notice them briefly, in order to see what instruc-

tions the Court gave the jury at his instance. By granting his first prayer the jury were instructed that it was the defendant's duty to use reasonable care that the machinery with which the plaintiff in his capacity as servant was required to work, and the building in which the machinery was placed, should be reasonably safe, and if they find this building or machinery was through the want of reasonable care on the defendant's part unsafe in its original construction, or subsequently became unsafe for want of necessary repairs, and that the plaintiff was injured in consequence thereof, then he is entitled to recover, unless they further find that he knew that the building or machinery was unsafe and dangerous, or ought by the exercise of reasonable care on his part to have known it, or unless by his own negligence he directly contributed to the accident.

They were also instructed, at the instance of the plaintiff, that if they found that the defendant failed in its duty to use reasonable care to furnish him reasonably safe machinery with which to work, and that the plaintiff was injured in consequence thereof, then it is no defence that the defendant employed a skilful engineer to inspect and superintend the erection of said machinery; and also that if they found that the plaintiff was injured as stated in his first prayer, then in order to defeat a recovery on the ground of contributory negligence, the *onus* is upon the defendant to satisfy the jury that the plaintiff was guilty of negligence which directly contributed to the accident.

The defendant's fourth, fifth and eighth prayers relate to the same subjects and were granted. These are manifestly correct and though excepted to in the Court below, no objection has been made to them in argument in this Court. The only exceptions relied upon here are to the rejection of the plaintiff's second and third, and to the granting of the defendant's sixth

and tenth prayers; and these present but two questions.

1st. The first arises thus. The plaintiff not content with the granting of his first prayer, by his second asked the Court to instruct the jury that if they found that the machinery was, owing to some defect in it or in the building in which it was placed, unsafe and dangerous, by reason of the negligence of the defendant, then in order to establish that the plaintiff assumed the risks involved in using it, it is not sufficient to show that the machinery was defective, and that such defect was known to the plaintiff, but it *must appear* that the *danger* was known to him as well as the defect which caused the danger, or that by reasonable care on his part it would have been known to him. This instruction the Court refused to give, and by granting the defendant's sixth prayer, instructed the jury that notwithstanding they may find that the machinery was in some respects defective, or out of repair, yet if they further find that the plaintiff knew of such defect or want of repair, or by the use of reasonable care might have known it, and *continued* in the use of the machinery in the service of the defendant with that knowledge, or after he might by the use of ordinary care have obtained it, and that the accident complained of happened when he was thus in the use of the machinery, from such defect or want of repair, he cannot recover. The Court also granted the defendant's seventh prayer, to the effect that if the jury find that the accident occurred from the use of defective machinery, the character, construction, defects, and operation of which were open and obvious, and that the plaintiff knew of such defects, or by the use of ordinary care might have known of them, then he cannot recover, notwithstanding the jury may find that the machinery was in fact imperfect and dangerous.

Are these rulings as applicable to the present case correct?

We take it to be clear as a general rule, that the servant assumes all such risks arising from his employment, as he knew or in the exercise of a reasonable degree of prudence might have known were naturally and reasonably incident thereto, and he cannot recover against the master for injuries arising from such *patent* risks; and if, therefore, the machinery or appliances which the master furnishes him contain *obvious* defects, of which the servant knew or as a reasonably prudent man might have known, or if he continues in the service after he has discovered, or by the exercise of reasonable care might have discovered, the existence of such defects, he cannot recover against the master for injuries resulting therefrom. It may be assumed that this rule applies only to patent or obvious defects, such as persons of ordinary care would be likely to discover, and that the servant is not bound to inspect the appliances to see whether or not there are *latent* defects that render their use more than ordinarily dangerous, but is only required to ascertain such defects or hazards as are obvious to the senses. 2 *Wood's Master and Servant*, (2d Ed,) sec. 376. Hence in cases where knowledge of the defects does not necessarily carry with it knowledge of the resulting danger, it may be proper for the Court to instruct the jury as requested in the plaintiff's second prayer. But this is not a case of that character.

Here the work the plaintiff was engaged in was the simplest kind of manual labor, and the machine he used was exceeding simple in its construction and operation. The story of the building in which it was located and operated, was open from the floor to the rafters. The wheel and track on which it ran were not more than seven feet above the eyes of a man of ordinary height, were open to view, with no part covered or concealed,

and there was nothing latent about the whole apparatus. The plaintiff, we must assume, was a man of ordinary intelligence, for there was no proof that he was stupid or dull of intellect, that any of his senses were impaired, or that he was not possessed of ordinary powers of observation.  Moreover, he was perfectly familiar with the machine and its working.  He had worked with it for three months in the preceding fall and winter, and during that time the wheel, while he was working it, fell from the track at least once in the same place it fell on the occasion of this accident.  It is true, he says, he was told it fell on the first occasion because it was worn out, and that a new one was put on which as far as he knew never came off again until the accident.  But the unevenness of the track, caused by the depression of the rails at the joints, continued, and the wheel was not secured, so that it could not leave the track until after the accident.  During all this time, he admits he knew the difficulty of pushing the wheel over the joints, and that it would stop at the joints. He also knew, as he admits, the importance of keeping the cooler level, especially as it approached the elevator platform.  When he returned to the employment of the defendant in the spring of 1886, he asked to be put at the same work, and had been so engaged for about two weeks before the accident occurred, with the wheel and track in the same condition they were in when he left them in the preceding winter.

Under these circumstances, this, as it seems to us, is clearly a case where knowledge of the defects necessarily, and in legal contemplation, carried with it knowledge of the risk or danger, and not a case where knowledge of the defects could possibly warrant any other conclusion than that the risk was voluntarily incurred.  In fact, the only risk or danger arising from the defects in the track complained of, was that they

might cause the wheel to jump or leave the track, and fall to the floor, and this was what actually occurred. Legal language has no meaning, unless knowledge such as the undisputed facts of this case, (and such as the defendant's sixth and seventh prayers left to the finding of the jury,) show the plaintiff had, amounts to a voluntary encountering of the risk. In such cases the law imputes and presumes knowledge of the risk or danger, and will not allow the injured workman to aver or prove that he had no actual knowledge thereof. The law as thus stated, and the sufficiency in similar cases, of the instructions contained in these granted prayers of the defendant, have been sanctioned by repeated decisions of this Court. *Wonder vs. Balto. & Ohio Railroad Co.*, 32 *Md.*, 420; *Balto. & Ohio Railroad Co. vs. State, use of Woodward,* 41 *Md.*, 298; *Cumb. & Penn. R. R. Co. vs. State, use of Moran,* 44 *Md.*, 292, 293; *Balto. & Ohio R. R. Co. vs. Stricker,* 51 *Md.*, 68; *Penn. R. R. Co. vs. Wachter,* 60 *Md.*, 400; *State, use of Hamelin, et al. vs. Malster & Reaney,* 57 *Md.*, 312, 313. In many of these cases, English authorities to the same effect are cited, and to these we may add the following observation made by COCKBURN, C. J., in *Woodley vs. Metropolitan District Railway Co., Law Rep.,* 2 *Excheq. Div.,* 384: "But looking at the matter in a legal point of view, if a man, for the sake of the employment takes it, or *continues* in it with a knowledge of its risks, he must trust to himself to keep clear of injury." Nor do we find any thing in the judgment of BOWEN, L. J., in *Thomas vs. Quartermaine, Law Rep.,* 18 *Q. B. Div.,* 685, which was much relied on by the learned and able counsel for the appellant, in conflict with the views we have expressed. On the contrary, we think that judgment sustains our view of the law as applicable to a case like the present. We could cite to the same effect a large number of cases in Courts of last resort in other

States, but we deem it unnecessary, as we consider the law upon the subject clearly settled by our own Maryland decisions, which are, of course, binding authorities for us, whatever may be the decisions elsewhere. We therefore find no error in these rulings.

2nd. The second question is whether Dennis Cawley was a fellow-servant of the plaintiff or a vice-principal, or such agent of the defendant corporation, as to make the latter responsible for his negligence. By his third prayer the plaintiff asked the Court to instruct the jury that if they found that the *management* of the works was committed by the defendant to Cawley, who was charged by it with managing and keeping the same in order, and that the machinery was out of order and in a dangerous condition, and Cawley had notice thereof or by reasonable care might have known it and had it repaired, then Cawley was negligent, and his negligence in this respect is the negligence of the defendant. This prayer the Court rejected, and granted the defendant's tenth prayer, by which the jury were instructed that, under the undisputed evidence in the case, Cawley was a fellow-workman of the plaintiff at the time of the accident, and if they find the injury complained of was occasioned by his negligence in not repairing the machinery, then the plaintiff cannot recover, unless they find the defendant did not use reasonable care in the employment of said Cawley, of which there is no evidence. The Court also granted the defendant's ninth prayer to the effect that the plaintiff cannot recover, if they find the injury complained of was occasioned by the negligence of a fellow-workman, unless they find that the defendant did not use reasonable care in the selection of such fellow-workman, and that there is no evidence in the case legally sufficient to prove that the defendant did not use such reasonable care.

There was no proof whatever that the defendant did not use reasonable care in the selection of its employés, or that, after notice, it retained an incompetent or negligent one in its service. But objection was taken in the Court below, to the tenth prayer on the ground that it assumed facts. This objection is founded upon the assumption that Cawley's duties and authority, and the extent to which he was a representative of the company, was decided by the Court instead of being left to the finding of the jury. If there had been any conflicting evidence as to what Cawley's position and duties really were, this objection might have been good. But whether, upon a given state of facts, a party is a fellow-servant, or a deputy master, or vice-principal, is undoubtedly a question of law to be decided by the Court. If therefore the facts were *undisputed* it was for the Court to say whether, under them, Cawley was a fellow-workman of the plaintiff or not, and it is our duty to decide as to the correctness *vel non* of that conclusion.

The law is well settled that one of the risks which a servant assumes when he enters the employment of a master, is the negligence of fellow-servants. But who are fellow-servants in the service of an individual master or a corporation is a subject that has been much discussed, and about which there is some conflict of authority. The question however has been before this Court on several occasions, and we must follow our own decisions. In *Wonder's Case*, 32 *Md.*, 418, it was laid down as a general rule, "that all who serve the same master, work under the same control, deriving authority and compensation from the same source, and are engaged in the same general business, though it may be in different grades and departments of it, are fellow-servants, each taking the risk of the other's negligence." In that case a brakeman was injured while using what he

alleged to be a defective brake, and it was held that he was in the same common employment with the mechanics in the shops whose duty it was to repair and keep the machinery in order, and with the inspector of machinery and rolling stock of the road, and the superintendent of the movement of trains. In the case of *Moran, 44 Md.,* 295, it was held that *agents* of the company who had *purchased* the defective engine were not fellow-servants of the fireman who was killed by its explosion. "As it was the duty" (say the Court) "of the defendant to supply as far as it could be done by the exercise of due and proper care, safe and sound machinery, the persons specially authorized to make the selection and purchase of the engine must be taken as the representatives of the defendant, and any omission or neglect committed by them must be regarded as that of the defendant and for which it is liable. These agents, therefore, thus entrusted with the duty of purchasing the engine are not to be regarded as fellow-servants of those operating it; for in respect to the selection and purchase of the engine they acted as agents representing the principal in regard to matters for which the latter might be liable to its servants." But the Court was careful to add that it did not follow from what they had thus said, that Jordan (who was one of these purchasing agents) was not in his ordinary employment as *master of machinery,* a fellow-servant of the fireman. In the case of *State, use of Hamelin, et al. vs. Malster & Reaney,* 57 *Md.,* 287, the subject was again carefully considered, and the authorities reviewed. After citing with approval numerous cases, both English and American, in which it had been held that a *superintendent* or *manager* is a fellow-servant within the rule which exonerates the master, the Court say: "To the general rule however there is this qualification or exception, that where the middle man or superinten-

dent is entrusted with the discharge of the duties
incumbent upon the master, as between the latter and
the servant, there the master may be liable for the
omission or neglect of the manager or superintendent
*in respect to those duties.* If the master relinquishes *all
supervision of the work,* and entrusts not only the super-
vision and direction of the work, but the selection and
employment of laborers, and the *procuring of materials,
machinery and other instrumentalities* necessary for the
service, to the *judgment and discretion* of a manager or
superintendent, in such case the latter becomes a vice-
principal, and for his omissions or negligence in the
discharge of those duties, the principal will be liable;"
and they cite *Moran's Case* as an example of this excep-
tion to, or qualification of, the general rule. Finally, in
the more recent case of *Baltimore Elevator Company vs.
Neal,* 65 *Md.*, 438, (a case which was decided after the
Supreme Court had rendered its decision in *Northern
Pacific R. R. Co. vs. Herbert,* 116 *U. S.*, 642,) we held
that the captain of a steam tug owned by the company,
was the fellow-servant of a common laborer who was
injured while in the company's service. "In such
case" (says the Court) "the principle is, that the
master is not liable for such injuries, unless he is
shown to have been guilty of negligence or the want of
ordinary care, either in the original employment, or
the subsequent retention in service, of the servant
whose alleged misconduct has caused the injury. Nor
is the liability of the master enlarged or made different
by the fact that the servant who has suffered the injury
occupied *a grade* in the common service *inferior* to that
of the servant whose misconduct caused the injury
complained of. And for the same reason it is not
necessary, to the exemption of the master from liability,
that the servant suffering the injury, and the one caus-
ing it, should be at the same time engaged in the same

particular work.  If they are in the employment of the same master, engaged in the same common work, and performing duties and services pertaining to the same general business, the master cannot be held liable to the one servant for injuries caused by the negligent or unskilful conduct of another, unless he has been negligent in employing or retaining in his service such negligent servant;" and the Court adds that this is now the doctrine settled by the great preponderance of authority both in this country and in England.

The law as laid down in these cases must govern the determination of the question now before us.  What then was Cawley's position, what authority did he have and what duties was he required to discharge? His own testimony on these points states all the facts, and stands undisputed.  There is no testimony coming from any other witness in conflict with it.  He testifies that he had been in the employ of the company at these "charbon works" as they are called, about a year before the accident; that he was chief manager there except that the officers of the company were over him; that he worked at charging the retorts, &c.; that he had no direct charge over the machinery but had the right to repair it and did repair it; that if the machinery broke down he would send to the North East office or to the Philadelphia works; that he supposed it was his duty to see whether the rail was broken down; that if it broke down he should have to order one through the company's office; that he had no authority to buy one; that Mr. Harvey was the president, Mr. Enoch McCullough the vice-president, Mr. McDaniel the secretary, and Mr. Whitely the treasurer, of the company; that Mr. Harvey was there quite often—once a week—and inspected all the machinery and things and looked after things in general, and would order changes; that Mr. McCullough was

.there sometimes once and sometimes twice a week, and sometimes once in two weeks, and would also examine the machinery and works; that the secretary and treasurer also if they saw anything wrong would have it fixed; that witness had no official name, but he hired and discharged men, kept their time, made out the pay-roll and sent it to the company's office, where the money due each one was put in an envelope, and when he received it he gave it to the men; that he did not buy supplies, and had no authority to buy, or alter, or change machinery; that if anything wore out he would report it to the company and they would buy; that he could not replace a broken rail, but could put a bolt in or something of that sort; that if machinery broke he must give notice to the company and they would send men to repair it or order the men to do it; that if anything broke that could be repaired at the works then he would do it, but a new rail he would have to order from the company; that there was no other manager of the company there but himself; that he was hired by the month and was paid a monthly salary.

Now from this statement of his position, authority and duties, (which we have given at length,) it seems quite impossible, in view of the authorities which are binding upon us, to hold that Cawley was other than a fellow-servant of the plaintiff. His duties and authority were of a very restricted character, and he was under the constant supervision and control of the officials of the company. Nothing of importance was left to his discretion and judgment. All supervision of the work was not relinquished by the company to him, nor was he entrusted with authority to procure materials, machinery and other instrumentalities necessary for the work according to his own discretion and judgment. Even in regard to repairs he occupied no higher position than the mechanics in the shops, or the inspec-

Yates *vs.* McCullough Iron Co.

tor of machinery in the cases referred to. In short we are clearly of opinion that the facts here stated, utterly fail to elevate Cawley to the position of vice-principal or representative of the company. In our judgment, they leave him in legal contemplation as simply the fellow-servant of the plaintiff, and we accordingly affirm the rulings of the Court below on this subject.

But counsel for the appellant insists that the tenth prayer is defective for another reason. The argument in his brief is that if it be conceded that Cawley was a fellow-workman, and that his negligence *in part* contributed to the injury, still if defendant's negligence also contributed to it, the plaintiff would be entitled to recover notwithstanding the defendant's negligence was not the *sole cause* of the injury. But we do not understand this prayer as presenting any such proposition. It asserts that Cawley *was* a fellow-servant of the plaintiff, and then leaves it to the jury to find that the injury was *occasioned by his negligence* in not repairing the machinery, and it then asserts that if they so find, that is to say, if they find that the injury was caused solely by *such* negligence, then the plaintiff is not entitled to recover. Such is our interpretation of this instruction, and it leaves no room for the interposition of the proposition contended for. If the plaintiff desired to raise such a question he should have distinctly presented it by asking an instruction to that effect. But this he did not do, and the question not being before us, and not having been argued by the other side, we abstain from expressing any opinion in regard to it. Neither is the proposition contained in the plaintiff's seventh prayer which was granted, brought up for review by this appeal.

*Judgment affirmed.*